Cabell, J.
The intention of the testator to emancipate his slaves, is too evident to require argument; and it is equally clear, that there is nothing illegal in the mode which he has adopted, for the execution of that intention. Slaves may be emancipated by deed or will, at the pleasure of their owners : but they forfeit their freedom unless they remove, within twelve months, beyond the limits of the commonwealth. It can, therefore, be no objection to the emancipation, in this case, that the testator has directed it on the condition of their willingness to go to Liberia.
As to the objection that Dissosivay, the trustee, may fail to perform, or may violate, the trust, there is no reason to suspect such violation. The testator who knew him, has confided to him the execution of his benevolent intentions; and we ought not to deprive him of all power to execute them, on the mere allegation that he may, possibly, act improperly.
The will imposed no obligation on the slaves to express their willingness to go to Liberia, until they were properly called on to make their election. If the residuary legatee wished to avail himself of the rights which would accrue to him, on their refusal to go to Liberia, it was his duty to take measures for compelling them to make their election.
I approve of the principle declared by this court, in the case of Isaac v. West, 6 Rand. 652. that every instrument conferring freedom, should be construed liberally, in favor of liberty. And under the influence of this principle, I am of opinion, that, even if the colonization society should be unable or unwilling, to transport these people to Liberia, they would still be entitled to their freedom, provided any other person would furnish the means of sending them there. The testator did not mean to burthen his estate with this expense; but he cared not who else might bear it.
*261 I think the children born since the death of the testator, are entitled to their freedom, equally with their mothers. If the mothers, are to be considered, by relation, as free from the death of the testator, then the children, following the condition of the mothers, were free at their birth—or, if the children were born slaves, they were the slaves of the testator, and, as such, they passed by the will, with their mothers, to be sent to Liberia.
It is not to be believed, that this benevolent testator, in emancipating the mothers, intended to separate from them their infant children, and to consign them to slavery. He intended that the election of the mothers should decide the destiny of their infant offspring.
But the decree is erroneous in the particulars mentioned by my brother Carr, and I concur in the correction of it proposed by him.
Brooke, J. concurred.
Tucker, P. The first questions in this case, turn upon the intention of the testator and the legality of that intention. Of the intention, I think, there can be no reasonable doubt. It has become a matter of history that a colony has been established at Liberia for the reception of emancipated slaves, and that slavery is there unknown. The testator, in reference to this well known state of things, devises his slaves to a trustee, for the purpose of being sent to that colony. If his will be executed in terms, they must be free; and it is therefore equivalent, to say that he willed that they should be free. However, or by whatever words, the intention is expressed, that intention must prevail; for there is no prescribed form in which the benevolent design to emancipate a slave is required to be expressed. As little doubt exists of the legality of this intention. The slaves were not to be free until they should be sent to Liberia; and they were net to be sent there against their consent. It is not perceived, that there is any thing in the policy of the *262 law, as there certainly is not in its statutory provisions, which - ... ... 1 - , iorbids an emancipation by transportation to a tree colony.
That such transportation will necessarily operate as an emancipation, has been questioned in the argument, because the slaves may be brought back to Virginia, and then upon the principle decided by lord Stowell in the case of The mongrel woman Grace, they will be slaves again. But this argument is refuted by two considerations: 1, that bringing them back by force or against their will, would not restore them to their original status; for it is the voluntary return to their own country in slavery, from which it is implied, that the original status was not changed during their residence in a land where slavery is unknown : and 2. to bring them back again into slavery, would be directly to frustrate the testator’s will, that they should be free, and is therefore not an admissible supposition.
It was next contended, that the gift of freedom by this will, depends upon the performance of two precedent conditions, with which that gift has been clogged; namely, that they shall make their election in the space of a year, and that the expense of transportation shall be paid by the colonization society. , As to the first, the phraseology of the will is not exactly what, the argument supposes. It is, as to the remaining slaves besides Clara and her family, as follows: “Those who are willing to go shall be sent to Liberia; those who prefer staying, shall be given, within twelve months after my decease, to my brother John Elder.” By this clause, it was argued, the testator intended to create a condition, and that his slaves should only be free on condition. But what was that condition ? It was that they should be willing to be transported. But, surely', there is nothing from which we can infer, that the time of declaration of their willingness, was of the essence of the condition. Contemplating that the affairs of his estate would speedily admit of the execution of this bequest, desirous to hasten that execution, on the one hand, and to pass over the property at once to his brother, on the other, if they should refuse to go, he *263 fixes on the twelve months, as the probable time when they should be delivered to him. If the affairs of the estate should unexpectedly prevent an assent of the executor to this bequest of freedom within the year, or if the slaves should have been kept in ignorance of his benevolent intentions, until the year had gone by, can we believe, for a moment, that it was his design that they should Jose their right to the boon he bequeathed to them ? I think not. But this is not all. The will does not say they must elect within the year. It declares, that those who prefer to stay shall be given within twelve months after his death, to his brother. The question then would be, have any preferred to stay within the twelve months; and if not, then the gift over cannot take effect, if we are to give this rigorous construction to the clause. But the truth is, such a construction is incompatible with a fair view of the testator’s designs; of the nature of the case; and of the character of the beneficiaries. They were ignorant slaves: they could not be free without the executor’s assent, and the great object of their master was to effect their liberation, as soon as it was probable that assent could be safely given. Whenever the executor was prepared to assent to this legacy of freedom, the testator gave them a choice : that choice implies that the proposition should be submitted to them ; submitted by that individual (the executor) who still held them in his hands. Until that was done, they were not, I conceive, called upon to declare, whether they were willing to go, or preferred to stay. I, therefore, think there is no obstacle to the execution of the will in their favor, arising out of the delay. Then, as to the provision, that the expenses should be defrayed by the colonization society. There is no assignable reason for supposing the testator made it a sine qua non, that that society should pay the expenses. His object was merely to provide that his estate should not be charged with them. But be this as it may, the case is not that of a bill by the slaves, to carry the trust into execution, in which they would have to prove that the society or some other *264 person was ready to incur the charge; but it is a bill by Elder, to reduce them to slavery, in which the onus would be upon him to shew, that the society had refused, to defray the expenses; for that is easily proved, if it be true. I think, therefore, there is nothing in this objection.
As to the increase born since the testator’s death, they were born slaves, as their mothers are yet slaves; but they fall as fully as their mothers, within the general expression, “ the rest of my negroes,” and of course are equally the objects of the trust. How their election shall be ascertained has been a subject of difficulty. In these anomalous cases respecting slaves, we must be guided by reason and good sense, in the absence both of authority and analogy. The course which was taken in the court below, seems to me both natural and judicious, and is therefore approved.
As to the hires : these must be brought into the account of the estate.- I cannot distinguish this case from Paup v. Mingo. Eissosway was a mere trustee, and takes nothing but in that character. He is, therefore, not entitled to the hires; nor are the slaves or the executor so entitled.
Upon the whole, I think the decree is right in all substantial points; though I do not concur in the correction of its details proposed by the other judges. I should have preferred a decree, directing the circuit court, to limit some reasonable time, within which the trustee Eissosway (or in case of his refusal or failure to execute the trust, such other fit person as may be willing to execute the same, to be appointed by the court) shall proceed to transport the slaves, who assent to .be transported, tó lobería, agreeably to the directions of the will; and to require from Eissosway (or such other trustee) bond with surety in an adequate penalty, with condition, either to execute the trust to the best of his ability within the time so limited, or to deliver the slaves (deaths and accidents excepted) to the appellant as his property. I concur in the opinion of the other judges, that the circuit court erred in requiring the refunding bond, which in cases of emancipation, cannot properly be demanded; *265 and that liberty should be reserved to the parties, to resort to the court, at any time hereafter, for its aid, in any future event which may render it necessary and proper.
The decree entered by the court, declared, that there was no error in so much of the decree, as directed the executor to deliver the slave Mingo to the appellant, on the terms therein stated, and to deliver the other slaves to Dissosway, to be by him sent to Liberia ; but that so much of the decree as suspended the delivery of these slaves to Dissosway, till he should give bond and security in the penalty of 4000 dollars, to refund in case debts should subsequently come against the estate, was erroneous; this court being of opinion, that, under the circumstances of this case, no such bond should be required—and that liberty ought to be reserved to the parties, to apply to the court for its further aid, if, at any future time, such aid should, in their opinion, become necessary for the due execution of the testator’s will.
Decree reversed, with costs to the appellee, as the party substantially prevailing, and the cause remanded to the circuit superiour court of Petersburg &c.